UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES REDMOND,

               Petitioner,                      Case No. 07-15152
                                                        Honorable David M. Lawson

v.

JAMES WORTHINTON and KENNETH J. AUD,

               Respondents.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner James Redmond, the former superintendent of the Oakland Intermediate School District (OISD), was convicted of the common law crime of misconduct in office as a result of self-dealing and other acts of misconduct. He also was convicted of violating Michigan Compiled Laws § 15.322, which prohibits contracts between public servants and the public entity of which the public servant is an officer or employee. The principal bases of the charges were agreements the petitioner made or arranged between OISD and the MINDS Institute, a nonprofit organization, when the petitioner chaired the MINDS Institute board of directors and simultaneously acted as OISD superintendent. He was sentenced to concurrent custody terms of six months and ninety days for these two convictions, but he has been on bond during his direct appeals and this ensuing habeas proceeding.

Redmond's petition, filed under 28 U.S.C. § 2254, challenges the sufficiency of evidence to support the convictions; attacks the trial court's use of a general verdict form because the jury could have convicted the petitioner on an invalid legal theory; asserts that his right to due process was violated when the court allowed the prosecutor to use as evidence of misconduct severance agreements not approved by the OISD because the examining magistrate did not bind the petitioner

over for trial on that theory of misconduct; disputes the admission into evidence of a school board resolution, contending that it violated his Sixth Amendment right to confrontation; takes issue with a jury instruction that defined the mental state required for misconduct in office; and contends that the prosecutor committed misconduct in closing argument.  The respondent has filed an answer to the petition, contending that the petitioner's claims either lack merit or are procedurally defaulted. The Court finds that the petitioner's convictions and sentences are constitutionally sound. Therefore, the Court will deny the petition.

I.

The parties do not contest the fact description made by the Michigan Court of Appeals on direct review, and in any event it is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).  That court of appeals summarized the facts as follows:

> Defendant's convictions arose out of his conduct related to his position as superintendent of the Oakland County Intermediate School District (OISD), a position which defendant held from 1995 until he was terminated by the OISD board of education (OISD board) effective January 31, 2003.  The evidence at trial established that defendant failed to disclose to the OISD board that he was chairman of the board of directors of the MINDS Institute, a non-profit organization, that he entered into contracts with the MINDS Institute on behalf of the OISD while he was simultaneously acting as superintendent of the OISD and serving on the board of the MINDS Institute, which resulted in the OISD paying the MINDS Institute more than $500,000 for its services, that he failed to truthfully respond to a letter from the Michigan Department of Education inquiring whether defendant or any of his relatives profited financially from the contractual arrangement between the OISD and the MINDS Institute in that he failed to disclose that his son worked for MINDS, LLC, the for-profit companion company of the MINDS Institute, that he authorized severance packages for two OISD employees without the OISD board's approval, that he authorized the payment of $397,220 to the MINDS Institute without a contract modification, and that he directed John Fitzgerald, Director of Financial Services of the OISD, and Mark Rajter, Assistant Superintendent for Resource Management of the OISD, to recalculate his vacation payout in a manner inconsistent

-2-

with the standard practices of the OISD, which resulted in defendant receiving an additional vacation payout in the amount of $6,972.50.

. . .

Evidence established that defendant began his employment as superintendent of the OISD in 1995 and that he became chairman of the board of the MINDS Institute in May 2000. On September 25, 2000, defendant, on behalf of the OISD, signed and entered into two three-year contracts with the MINDS Institute. These contracts were the Subscriber Agreement and the Content Agreement. At the time defendant entered into the Subscriber Agreement and the Content Agreement, he was simultaneously employed as the superintendent of the OISD and serving as chairman of the board of the MINDS Institute. The developer of MINDS, Marvin Sauer, met defendant in 1999. Sauer was seeking an educational partner that understood the educational marketplace and believed that the Oakland schools would be a good partner because the schools were well-known and well-respected. Because defendant was superintendent of the OISD, Sauer asked defendant to participate in the MINDS project so that defendant could offer his vision and guidance and assist with the direction of the MINDS project. According to Sauer, defendant was helpful in validating that the technology would make sense in an educational environment. In light of Marvin Sauer's testimony regarding defendant's involvement in the MINDS Institute as the concept was developing and before it was officially incorporated in April 2000, the evidence, the circumstantial evidence, and the reasonable inferences therefrom, establish that defendant solicited, either directly or indirectly, the Subscriber Agreement and the Content Agreement between the OISD and the MINDS Institute in violation of MCL 15.322(2)(b) while he was simultaneously employed as the superintendent of the OISD and acting as the chairman of the board of the MINDS Institute and that by signing those two contracts on behalf of the OISD, defendant represented the OISD in entering into the contracts in violation of MCL 15.322(3)(b). In addition, although other representatives of the OISD and not defendant signed the Contracted Services Contract between the OISD and the MINDS Institute, in which the MINDS Institute agreed to digitize 160 hours of video for the OISD in exchange for payment of $120,000, reasonable inferences from the evidence regarding defendant's early involvement with the MINDS Institute and his meetings and discussions with OISD administrators regarding MINDS suggest that defendant was part of the discussions and negotiations that led to the formal adoption of the Contracted Services Contract. Thus, there was also sufficient evidence that defendant was involved in soliciting and negotiating the Contracted Services Contract between the OISD and the MINDS Institute in violation of MCL 15.332(2)(b) and (3)(a).

*People v. Redmond*, No. 261458, 2006 WL 3298360, at *1-2 (Mich. Ct. App. Nov. 14, 2006)

(footnotes omitted). The Oakland County, Michigan circuit court jury convicted the petitioner of

misconduct in office, a common law offense preserved by Michigan Compiled Laws § 750.505, and

of violating Michigan Compiled Law § 15.322, which prohibits contracts between public servants and the public entity of which the public servant is an officer or employee. The trial court sentenced him to six months imprisonment and three years probation for the misconduct in office charge, and 90 days imprisonment for violating section 15.322.

The petitioner then filed a direct appeal to the Michigan Court of Appeals, in which he raised the following issues: (1) insufficient evidence to sustain his convictions; (2) the trial court erred in permitting the prosecutor to present evidence at trial of improper severance agreements and vacation payout as theories under which defendant engaged in misconduct in office because the district court did not bind defendant over for trial on those two theories, and therefore the trial court lacked jurisdiction with respect to those theories; (3) the trial court erred in refusing to instruct the jury that the issue of Dr. Regis Jacobs's severance package was no longer before it; (4) the trial court violated the petitioner's right under the Confrontation Clause when it admitted into evidence the OISD's resolution terminating the defendant's employment and because the information contained in the resolution constituted hearsay and was prejudicial; (5) the trial court improperly instructed the jury on the element of corrupt intent necessary to convict defendant of the charge of misconduct in office; (6) the prosecutor made rebuttal closing arguments that were not supported by the evidence, and those arguments deprived him of a fair trial; and (7) erroneous and unconstitutional scoring of his sentencing guidelines. The court of appeals affirmed the conviction in an unpublished opinion, *People v. Redmond*, No. 261458, 2006 WL 3298360 (Mich. Ct. App. Nov. 14, 2006), and later denied the petitioner's motion for reconsideration, *People v. Redmond*, No. 261458 (Mich. Ct. App. Jan. 8, 2007). The petitioner filed an application for leave to appeal in the Michigan Supreme

Court raising the same issues, and that application was denied, as was the petitioner's motion for reconsideration. *People v. Redmond*, 480 Mich. 883, 960, 738 N.W.2d 225, 360 (2007).

In his timely-filed habeas petition in this Court, the petitioner raises the following claims for relief:

> I. Petitioner's due process rights were violated by the submission of the charges against him to the jury when no rational factfinder could have found the elements of those charges to have been proven beyond a reasonable doubt.
>
> II. Petitioner's due process rights were violated by the submission of the misconduct in office charge to the jury in such a way that they were allowed to convict him based on an invalid legal theory.
>
> III. Petitioner's due process rights were violated by the trial court's submission of the misconduct in office count where the circuit court lacked jurisdiction over two of the charges subsumed by it.
>
> IV. Petitioner's Sixth Amendment and fair trial rights were violated by the admission of a school board resolution containing extremely prejudicial "findings."
>
> V. Petitioner's due process rights were violated by the trial court's instruction on the misconduct in office charge's element of "corrupt intent."
>
> VI. Petitioner's due process rights were denied by uncorrected prosecutorial misconduct in closing argument.

Memorandum in Support of Ptn. at 10, 31, 33, 37, 45-46, 49.

On January 16, 2008, the petitioner filed an emergency motion for bond pending review of his petition for habeas corpus, which the Court granted on March 14, 2008. Thereafter, the parties filed their respective briefs.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the

standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review. In its recent unanimous decision in *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Sixth Circuit observed recently that "[t]his is a very high standard, which the [Supreme] Court freely acknowledges." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012). The court suggested that *Richter* holds that the review standard "is even more constricted than AEDPA's plain language already suggests." *Ibid.*

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on

-7-

grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours,

its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise,

and the judge neither asked for elaboration of the foreperson's answers nor took any other measures

to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal

quotation marks and citations omitted)); *see also Peak*, 673 F.3d at 473-74; *Bray v. Andrews*, 640

F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy

v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir.

2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th

Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas

review is "limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---,

131 S. Ct. 1388, 1398 (2011).

A.

The petitioner first argues that there was insufficient evidence to sustain his convictions.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a

reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re

Winship*, 397 U.S. 358, 364 (1970).  The critical inquiry on habeas review of the sufficiency of the

evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a
> reasonable doubt . . . . [T]his inquiry does not require a court to "ask itself whether
> it believes that the evidence at the trial established guilt beyond a reasonable doubt."
> Instead, the relevant question is whether, after viewing the evidence in the light most
> favorable to the prosecution, *any* rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted).  In the

habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive

-8-

elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. *Id.* at 788. "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, --- U.S. ---, ---, 130 S. Ct. 665, 673 (2010) (citations omitted). Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Id.* at 788-89. The Court does not need to be convinced that the petitioner is actually guilty beyond a reasonable doubt. *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir.1995).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205 (citing *Jackson*, 443 U.S. at 319). Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Ibid.*

1.

-9-

The Michigan Supreme Court has defined misconduct in office as "'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.'" *People v. Perkins*, 468 Mich. 448, 456, 662 N.W.2d 727, 732 (2003) (quoting *People v. Coutu*, 459 Mich. 348, 354, 589 N.W.2d 458, 461 (1999)); *see also People v. Hardrick*, 258 Mich. App. 238, 244-45, 671 N.W.2d 548, 552 (2003). Simple nonfeasance, malfeasance, and misfeasance are not enough. *Perkins*, 468 Mich. at 456, 662 N.W.2d at 732. "In the case of malfeasance and misfeasance, the offender also must act with a corrupt intent, *i.e.*, with a sense of depravity, perversion or taint." *Ibid.* (citations and quotations omitted).

> "Depravity" is defined as "the state of being depraved" and "depraved" is defined as "morally corrupt or perverted." Random House Webster's College Dictionary (1997). "Perversion" is "the act of perverting," and the term "perverted" includes in its definition "misguided; distorted; misinterpreted" and "turned from what is considered right or true." *Id.* The definition of "taint" includes "a trace of something bad or offensive." *Id.* Pursuant to the definitions, a corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer. See also Perkins & Boyce[, Criminal Law (3d ed.)], at 542 ("It is corrupt for an officer purposely to violate the duties of his office."). The corrupt intent needed to prove misconduct of office does not necessarily require an intent for one to profit for oneself.

*People v. Coutu (On Remand)*, 235 Mich. App. 695, 706-07, 599 N.W.2d 556, 562 (1999) (citation omitted).

The prosecutor offered six instances of corrupt behavior to support the charge of misconduct in office: (1) embezzling money by directing the improper calculation of a *per diem* pay rate when he redeemed 30 days of vacation pay; (2) paying severance packages to employees the petitioner wanted to quietly separate without Board approval; (3) misrepresenting to the Michigan Department of Education that no one in the petitioner's family benefitted from his duality with the OISD and the MINDS Institute; (4) signing a contract with the MINDS Institute on behalf of the OISD at the same

time the petitioner chairman MINDS Institute's board of directors; (5) misrepresenting or failing to inform OISD of his position at the MINDS Institute; and (6) authorizing payment of $397,220 by the OISD to the MINDS Institute without a proper contract modification. The State needed to prove only one of the factual predicates beyond a reasonable doubt to convict the petitioner of misconduct in office.

The Michigan Court of Appeals reviewed the evidence and found it to be sufficient as to all six theories. That court found that the "[d]efendant committed acts of malfeasance or misfeasance under the color of his position as superintendent of the OISD, and this conduct was bad or offensive. Therefore, there was sufficient evidence that defendant's conduct was 'tainted' and therefore corrupt." *People v. Redmond*, 2006 WL 3298360, at *2.

This Court has reviewed the record thoroughly and concludes that the state court's determination amounted to a reasonable application of Supreme Court precedent. There is evidence in the record from which a rational jury could conclude that the petitioner committed misconduct in office under each of the six theories advanced by the State. The Court will address each in turn.

a. Vacation payout

The petitioner argues that the prosecution failed to demonstrate that he was not entitled to the additional $6,972.50 of vacation payout he required the financial services department to issue. He says that nothing in his contract limited the calculation of his *per diem* to his base pay divided by the number of business days. Rather, he relies on the Black's Law Dictionary definition of *per diem* — by the day; for each day — to suggest that he was entitled to include the non-base pay

-11-

elements of his compensation package in valuing his 30 days of vacation.  The State admits that neither the petitioner's contract nor OISD had a written definition of *per diem*.  However, testimony offered at trial established that OISD's standard practice for *per diem* payouts was to use the base salary divided by the number of business days.  The evidence, when viewed in a light most favorable to the prosecution, demonstrates that the petitioner, under the color of his office, committed malfeasance by performing a discretionary act with corrupt motive — that despite legitimate doubts about his entitlement to the extra funds, he directed the payout — and the jury reasonably could have found that the petitioner's behavior was bad or offensive.

Mark Ratjer, OISD's assistant superintendent for resource management, testified that the *per diem* rate normally is "calculated using their base pay, base gross pay divided by the number of days,"  Trial Tr., Jan. 24, 2005 at 413-44, and that the per diem rate does not include the employee's tax sheltered annuity contributions (TSA), which is compensation deferred until retirement. Evidence was presented that showed the petitioner directed Ratjer and John Fitzgerald, director of financial services for OISD, to recalculate his cash payout for 30 days of vacation that he sold back to OISD based on a methodology that was not used for other employees.  The petitioner directed Fitzgerald and Ratjer to include his TSA contributions, social security, medicare, and member investment plan contributions in his *per diem* rate, resulting in an additional $6,972.59 being paid out.  Ratjer objected because he thought it was improper but relented because the petitioner, as the superintendent, had the final say.  Ratjer testified that the petitioner's position was the sole reason his *per diem* was recalculated.  Janet Thomas, an OISD board member, testified that the board did not approve the payment.

-12-

The Court finds that a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt based on this theory. The appellate court's sufficiency determination was not unreasonable.

### b. Severance Packages

The petitioner argues that there is no evidence that he terminated William Lee's and Barbara Rebbeck's employment for perverse, depraved, or tainted motives. Rather, he argues, the evidence supports the opposite conclusion because the recommendations for non-renewals were made by other administrators and the petitioner did not prepare their severance packages, make the severance package offers, or sign the severance agreements on behalf of OISD. The State argues that it presented evidence to establish that the petitioner wanted to get rid of Lee and Rebbeck because they had opposed him, and that because he had no sufficient performance-related reason to present to the board of education for not renewing their contracts, the petitioner lied when he told Richard Simonson, OISD's deputy superintendent who signed the severance agreements, that the board had approved the agreements. The State argues that petitioner's decision to arrange for Lee's and Rebbeck's severance packages without the board of education's approval because he wanted to terminate their employment for crossing him constitutes malfeasance with corrupt intent.

The record evidence supports the States argument. Bill Lee, OISD's plant and facilities consultant, testified that he had several disagreements with the petitioner during his employment with OISD. One such disagreement was when Lee was asked by Dr. Robert Nugent, an assistant superintendent, at the petitioner's behest, to recalculate the square footage of the new OISD administration building that would be used for special education purposes to include common areas, corridors, meeting rooms, and storage areas. Lee testified that he was instructed to recalculate the

-13-

square footage to "make sure that they were getting the maximum amount from special ed as far as being able to charge them in square footage-wise." Trial Tr., Jan. 20, 2005 at 99. Lee also testified that he disagreed with the petitioner's idea to build a new administration building on land that contained wetlands. Lee also testified that he was told that his contract would not be renewed due to a reorganization and not because of his performance, and that if he resigned he would receive a severance package. Lee's severance agreement, which Simonson signed, gave Lee $41,315.87 gross, resulting in a net check for $25,000.

Barbara Rebbeck, who was employed by OISD as a language arts consultant and director of the Oakland Writing Project, testified that in 1997, she, along with six other OISD employees, helped conduct a survey of OISD employees' views on the management of OISD and delivered results to the board of education that painted OISD's management in a negative light. Rebbeck also testified that after being told her employment contract would not be renewed, she signed a severance agreement that was not approved by the board of education. Rebbeck testified that she did not believe that any of the other survey conductors were terminated. John Fitzgerald testified that Rebbeck received $41,293.70 gross, resulting in a check for $25,000, for her severance package. Fitzgerald also testified that Ms. Rebbeck's severance was paid at the end of the fiscal year, after the final budget amendments had been made.

Dan Austin, the then-current deputy superintendent of OISD, testified that after being informed by Rick Simonson that Rebbeck's and Lee's contracts would not be renewed, he advised Simonson that there was not a sufficient record of deficient performance to place Lee and Rebbeck on the non-renewal list. Instead, Austin suggested that Rebbeck and Lee be given severance packages to avoid potential lawsuits. Simonson testified that the petitioner told him that the board

-14-

had approved the severance packages, but Dianne Leitermann, a member of OISD's board of education in 2001, testified that the board did not approve Lee's or Rebbeck's severance packages. Austin further testified that after the severance packages had been signed, he checked the board of education's records to determine whether the severance agreements had been approved but could not find any evidence that the board of education approved them.

From that evidence, a reasonable jury could have found beyond a reasonable doubt that the petitioner arranged for the severance packages without board approval, which amounted to malfeasance, and he did so with a corrupt motive. But even if that conclusion is not compelled, the Court is satisfied that the state court's sufficiency determination was reasonable in light of *Jackson v. Virginia*.

### c. Misrepresenting facts to Michigan Department of Education

In its audit of OISD for fiscal year 2000-2001, KPMG , the audit firm chosen by the board of education to conduct OISD's annual audit in 2001, included a footnote in its audit report that disclosed the petitioner's relationship with MINDS. In response, the Michigan Department of Education sent an inquiry to OISD asking for specific information regarding the OISD contracts with MINDS. The inquiry asked whether the petitioner or any of his relatives profited financially from the OISD-MINDS arrangement. The petitioner furnished an affidavit that was included in OISD's response, in which he answered the question in the negative despite the fact that his son had been hired by MINDS, LLC, a related company, in October 2000. The petitioner argues that his "no" response was true because his son, an entry level employee of MINDS, LLC, was not involved in either contract between OISD and MINDS Institute and did not profit from them. There is no proof, the petitioner argues, that his attempt to protect his son's privacy rose to the level of

-15-

"corruption."  The petitioner relies heavily on the fact that much of the digitization work was complete by August 2000, well before Marvin Sauer, chief financial officer of TLC Holding Group (TLC) (Minds's parent organization), knew that the petitioner's son was looking for work.  The State contends that the evidence establishes that the petitioner, in the exercise of his duties, committed malfeasance by performing a discretionary act with a corrupt motive.  It says that the petitioner provided a misleading and non-responsive answer to the Department's questions; a lie is enough to evince corrupt behavior; and even if a lie is not enough, the inferences arising from the direct and circumstantial evidence supported an argument that the petitioner lied to cover up the questionable circumstances surrounding his son's hiring and the depth of his personal involvement with the MINDS entities.

At trial, Sauer testified that he learned that the petitioner's son was available to be hired during a conversation he had with the petitioner and that he hired the petitioner's son to work at MINDS, LLC in October 2000, just months after OISD and the MINDS Institute entered into the digitization contract.  Sauer further testified that he expected to enhance his relationship with the petitioner by employing the petitioner's son.

Mark Ratjer testified that the petitioner, despite Ratjer's advise, did not disclose his son's employment with MINDS, LLC in his answer and affidavit in response to the Michigan Department of Education's question about whether any of his relatives profited financially from the digitization contract between OISD and the MINDS Institute.

That evidence would permit a rational jury to conclude that the petitioner was engaged in self-dealing through his position at the OISD, and that he misused that position in a corrupt way by deriving a benefit for his son, which he concealed from the Michigan Department of Education.  The

-16-

Court finds, therefore, that a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt and that the state court's sufficiency determination was not unreasonable.

### d. Self-dealing contracts

The petitioner argues that the evidence produced at trial overwhelmingly proved that his only purpose for signing the Subscriber and Content Agreements and for sitting on the board of directors of the MINDS Institute was to protect OISD's assets. Put more simply, he argues that the State failed to show that he entered the contracts for a corrupt purpose. The petitioner also argues that the evidence clearly showed that his presence on the MINDS Institute board of directors was as a representative of OISD. Further to that point, the petitioner argues that not one witness testified that he personally benefitted from his relationship with the MINDS Institute. The State counters that the petitioner acted wrongfully by entering into a contract on behalf of OISD with the MINDS Institute at the same time he was chairman of the board of the MINDS Institute in violation of Michigan Compiles Laws § 15.322, and that the jury reasonably could have found that the petitioner's behavior was bad or offensive.

Marvin Sauer testified that TLC served as an umbrella corporation to provide financial operations assistance to DataServ, which sells, installs, and maintains voice, video, and data equipment, and MINDS, LLC, which sells educational content to schools. The MINDS Institute, which was incorporated to gather the education content MINDS, LLC was to sell, was a separate organization that had a management agreement with TLC. The Michigan Court of Appeals summarized the companies' relationships.

> The concept behind the MINDS Institute was that it would provide digitized media services to educational institutions via fiber optic wiring that could be displayed on computers. The MINDS Institute itself was incorporated in 2000 to search out and obtain voice, video and data technology that would be supplied to educational

-17-

> institutions, and MINDS LLC was created to sell the voice, video and data
> technology to educational institutions.

*Redmond*, 2006 WL 3298360, at \*1 n.3.  Sauer testified that the petitioner was one of the signatory

incorporators of the MINDS Institute and eventually was made chairman of the board in May 2000.

Sauer also testified that the petitioner did not receive any compensation for serving on the board of

directors of the MINDS Institute.  But Sauer said that in return for providing MINDS Institute with

OISD's educational content, MINDS Institute would digitize the content and make it available to

OISD schools for a yearly membership fee of $50,000, and that it was vital to have the petitioner

on the board of the MINDS Institute because the petitioner would assist in acquiring and getting

licensing for the educational content MINDS, LLC would sell and to get business.

Sauer testified that OISD and the MINDS Institute entered into the Subscriber Agreement

and the Content Agreement on September 25, 2000.  Karl Seiler, who is the CEO of TLC, president

of DataServ, president of MINDS, LLC, and a board member of the MINDS Institute, signed on

behalf of the MINDS Institute and the petitioner signed on behalf of OISD.  In December 2000,

OISD and the MINDS Institute entered into a $120,000 contract for the digitization of 160 hours of

videotape.  Sauer testified that although not expressed in the digitization contract, the 160-hour

contract was part of a proposal to digitize 674 hours of videotape for OISD for $530,000.  Sauer

explained that the contract for 160 hours was all OISD could afford in that fiscal year and that the

balance would be billed the following fiscal year.  Although there was no written contract for the

remainder of the proposal, Sauer testified that MINDS, LLC, which was performing the

digitalization work, continued to digitize OISD's videotapes without a contract because he was

confident in OISD's ability to pay.

The Court is left with little doubt that the petitioner violated the precepts of Michigan Compiled Laws § 15.322. While superintendent of OISD and chairman of the board of the MINDS Institute, the petitioner represented a party to a contract between the two entities. The only question left is whether sufficient evidence was offered to establish corrupt intent. Under Michigan law, "a corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer." *Coutu*, 235 Mich. App. at 706, 599 N.W.2d 562. There is sufficient evidence in the record that the petitioner's actions were intentional and that his dual role benefitted MINDS Institute's procurement of the contracts. The Court finds that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

### e. Failing to reveal position on MINDS Institute board to OISD board

The petitioner argues that his relationship with the MINDS Institute was disclosed as early as 1999. He argues that the evidence demonstrated that Carol Klenow, assistant superintendent of student performance, received a memorandum from Jan VanDam regarding MINDS in October 1999; the memorandum recalled a meeting between VanDam, Karl Seiler, and Sauer regarding a collaboration between DataServ and OISD; Diane Leitermann, an OISD trustee, confirmed that the memorandum was provided to OISD's board; and the petitioner spoke to the board on November 9, 1999 about DataServ, the offer to form a partnership, and the request that he serve as CEO of the project. The petitioner also argues that Rick Simonson testified that MINDS was discussed at OISD board meetings beginning in the winter of 1999; the need for the petitioner to sit on the MINDS board was one of the subjects discussed; there were frequent discussions about the petitioner's position with MINDS during the summer of 2000; at an OISD board meeting, VanDam presented

-19-

the petitioner with an award that identified him as a founding board member of MINDS; and he recalled the petitioner disclosing his position with MINDS to the OISD board on more than one occasion. Additionally, the petitioner argues that he divulged his position on the MINDS Institute board to Carolyn Claerhout and Dennis Pollard when he sought a legal opinion as to the propriety of the MINDS Institute arrangement.

The State responds that the petitioner never affirmatively informed the OISD board that he was the chairman of the board for the MINDS Institute, and that the evidence supports an inference that petitioner did not inform the OISD board because he knew there was a question as to whether the relationship was appropriate because of the large contracts being executed between the organizations. The State also argues that the credibility of Simonson's testimony that the petitioner informed the OISD board of his position is questionable because the petitioner recommended Simonson be appointed deputy superintendent, Simonson grew close to petitioner, and Simonson received a $35,000 contract from petitioner to provide lobbying and consulting services after he retired.

The arguments raised by the parties plainly demonstrate that the fact question was vigorously contested at trial. However, the arguments the petitioner makes essentially are jury arguments. The evidence identified by the State permitted the jury to conclude that the petitioner committed misconduct by failing to disclose his position at MINDS Institute during the time when the lucrative contracts were negotiated and signed. In addition, Mark Ratjer testified that the petitioner was displeased that KPMG included a footnote in its 2001 audit report that disclosed the petitioner's relationship with the MINDS Institute. The petitioner also told Ratjer that he wanted to select a new auditing firm for the next fiscal year. Dianne Leitermann, an elected board member of the OISD in

-20-

2001, testified that in July 2001 at a board retreat, the petitioner presented information regarding the MINDS entities to the board and asked the board members what their thoughts were of his idea to sit on the board of the MINDS Institute, but he did not tell the board he had been serving as chairman of the board of the MINDS Institute for over a year. Leitermann testified that the petitioner did not inform the board that he was chairman of the board of the MINDS Institute at the retreat. Leitermann also testified that she did not know that the petitioner would serve on the board of the MINDS Institute when the board voted to join the MINDS Institute. Board member Janet Thomas testified similarly that although the OISD board often was presented with information about MINDS, they were never informed that the petitioner was chairman of the board.

The Court finds there is sufficient evidence in the record from which a reasonable juror could conclude that the petitioner did not inform the OISD board of his position with the MINDS Institute until KPMG included it in a footnote in the annual audit and that he did so with corrupt intent.

### f. Authorizing additional $397,220 payout

The final factual predicate underlying the misconduct in office charge was that the petitioner, with corrupt intent, illegally authorized an additional $397,220 payment to the MINDS Institute without a written contract modification. The petitioner argues that the uncontroverted evidence showed that the OISD board's June 25, 2001 consent agenda included approval of the payment to the MINDS Institute for digitization services and that the board meeting minutes reflected a purchase order for that amount. The petitioner further argues that Katrina Brunette, OISD's purchasing manager, testified that no written contract modification was required. The State argues

that the evidence demonstrates that the petitioner used his position as superintendent of OISD to advance the interests of the MINDS Institutes through the use of irregular procedures to effect the additional payment of $397,220, and that when the petitioner learned that OISD had additional funds, he immediately suggested that most of it be used to pay MINDS more money.

Mark Ratjer testified that in May 2001, he reported to the petitioner that OISD would have between $500,000 and $1,000,000 in extra money for the 2000-2001 fiscal year, which ended June 30, 2001, and that the petitioner immediately suggested making additional payments to the MINDS Institute. Ratjer also testified that he did not contact anyone at the MINDS entities to let them know there was extra money available in OISD's budget, yet OISD received invoices from the MINDS entities for $397,220 within a few weeks of the petitioner being notified of the budget surplus. The board of education approved paying the $397,220 purchase order from OISD's 2000-2001 fiscal year budget.

Katrina Brunette, OISD's purchasing manager, testified that contract amendments valued over $18,000 required the OISD department originating the contract to submit a contract amendment form to her office and then get approval from the board of education. She also testified that to get a contract modification on the board of education's consent agenda, the requesting department had to complete a board consent agenda form that included the name of the contractor, the dollar amount, the amount of the increase, the reason for the increase, the contract's time period, and the scope of services being provided. The $397,220 payment to the MINDS Institute was added to the board's consent agenda on June 25, 2011, just one day before the last board meeting of the fiscal year. Ms. Brunette testified that she was out of town on June 25 and the only way the $397,200 purchase order

could have been added to the board's consent agenda that quickly was if the petitioner approved the addition himself.

The Court finds that a reasonable jury could have found the essential elements of the crime of misconduct in office beyond a reasonable doubt based on this theory of misconduct. Moreover, even if the Court did not find as much, the Court is satisfied that the appellate court's sufficiency determination was not an unreasonable application of Supreme Court precedent.

2.

Michigan Compiled Laws § 15.322 provides, in part:

(1) [A] public servant shall not be a party, directly or indirectly, to any contract between himself . . . and the public entity of which he . . . is an officer or employee.

(2) . . . [A] public servant shall not directly or indirectly solicit any contract between the public entity of which he . . . is an officer or employee and any of the following:
    (a) Him[self] . . . .
    (b) Any firm, meaning a co-partnership or other unincorporated association, of which he . . . is a partner, member, or employee.
    (c) Any private corporation in which he or she is a stockholder owning more than 1% of the total outstanding stock of any class if the stock is not listed on a stock exchange, or stock with a present total market value in excess of $25,000.00 if the stock is listed on a stock exchange or of which he or she is a director, officer, or employee.

(3) In regard to a contract described in subsection (2), a public servant shall not do either of the following:
    (a) Take any part in the negotiations for such a contract or the renegotiation or amendment of the contract, or in the approval of the contract.
    (b) Represent either party in the transaction.

Mich. Comp. Laws § 15.322. Violation of the statute is a misdemeanor. Mich. Comp. Laws § 15.327.

The Michigan Court of Appeals discussed the evidence that supported the petitioner's conviction.

-23-

Evidence established that defendant began his employment as superintendent of the OISD in 1995 and that he became chairman of the board of the MINDS Institute in May 2000. On September 25, 2000, defendant, on behalf of the OISD, signed and entered into two three-year contracts with the MINDS Institute. These contracts were the Subscriber Agreement and the Content Agreement. At the time defendant entered into the Subscriber Agreement and the Content Agreement, he was simultaneously employed as the superintendent of the OISD and serving as chairman of the board of the MINDS Institute. The developer of MINDS, Marvin Sauer, met defendant in 1999. Sauer was seeking an educational partner that understood the educational marketplace and believed that the Oakland schools would be a good partner because the schools were well-known and well-respected. Because defendant was superintendent of the OISD, Sauer asked defendant to participate in the MINDS project so that defendant could offer his vision and guidance and assist with the direction of the MINDS project. According to Sauer, defendant was helpful in validating that the technology would make sense in an educational environment. In light of Marvin Sauer's testimony regarding defendant's involvement in the MINDS Institute as the concept was developing and before it was officially incorporated in April 2000, the evidence, the circumstantial evidence, and the reasonable inferences therefrom, establish that defendant solicited, either directly or indirectly, the Subscriber Agreement and the Content Agreement between the OISD and the MINDS Institute in violation of MCL 15.322(2)(b) while he was simultaneously employed as the superintendent of the OISD and acting as the chairman of the board of the MINDS Institute and that by signing those two contracts on behalf of the OISD, defendant represented the OISD in entering into the contracts in violation of MCL 15.322(3)(b). In addition, although other representatives of the OISD and not defendant signed the Contracted Services Contract between the OISD and the MINDS Institute, in which the MINDS Institute agreed to digitize 160 hours of video for the OISD in exchange for payment of $120,000, reasonable inferences from the evidence regarding defendant's early involvement with the MINDS Institute and his meetings and discussions with OISD administrators regarding MINDS suggest that defendant was part of the discussions and negotiations that led to the formal adoption of the Contracted Services Contract. Thus, there was also sufficient evidence that defendant was involved in soliciting and negotiating the Contracted Services Contract between the OISD and the MINDS Institute in violation of MCL 15.332(2)(b) and (3)(a).

*People v. Redmond*, 2006 WL 3298360, at *2 (footnote omitted). In addition to the evidence

reviewed by the Michigan Court of Appeals, Carol Klenow testified that the petitioner insisted that

the MINDS Institute do all the work with respect to digitizing OISD's educational assets.

-24-

There is no question that the a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt. The Michigan Court of Appeals reasonably applied *Jackson v. Virginia* when it concluded that the trial evidence was sufficient to support the conviction.

## B.

The petitioner's second claim is that the trial judge erred by refusing his request for a special verdict requiring jurors to specify the theory, or theories, of liability on which the misconduct in office conviction was premised. The petitioner argues that the sixth theory of liability for the misconduct in office charge — that the petitioner authorized payment of $397,000 to the MINDS Institute without a contract modification — was a legally insufficient basis on which to predicate criminal responsibility; therefore, his misconduct in office conviction must be set aside because the general verdict form did not reveal which theory the jury relied on to find petitioner guilty.

"A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008). An alternative-theory error is harmless if the error "does not categorically vitiate all the jury's findings." *Id.* at 61 (quotations and alterations omitted). Although the Supreme Court "did not specifically identify the harmless-error standard that is applicable to alternative-theory errors," "it cited [] a string of cases that apply a common harmless-error standard to other types of instructional errors." *United States v. Skilling (after remand)*, 638 F.3d 480, 481 (5th Cir. 2011) (citing *Pulido*, 55 U.S. at 60-61 (citing *Neder v. United States*, 527 U.S. 1 (1999) (omission of an element of an offense); *California v. Roy*, 519 U.S. 2 (1996) (per curiam) (erroneous aider-and-abettor instruction); *Pope v. Illinois*, 481 U.S. 497 (1987) (misstatement of an element of an offense); *Rose v. Clark*, 478 U.S. 570 (1986) (erroneous burden-shifting as to an element of an

offense))).  In *Neder v. United States*, the Court found that an error was harmless if a court, after a "thorough examination of the record," is able to "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error."  527 U.S. at 19.  If the defendant "raised evidence sufficient to support a contrary finding," then the error was not harmless.  *Id.*

As discussed above, the sixth factual predicate was legally sufficient to support a conviction for misconduct in office.  However, there is some doubt whether the fourth factual predicate — engaging in the self-dealing contracts in violation of Michigan Compiles Laws § 15.322 — can support the conviction of that common law crime because a specific statute applies to the conduct called into question.  *See People v. Waterstone*, --- N.W.2d ---, 2012 WL 1192137 (Mich. Ct. App. Apr. 10, 2012) (holding that Mich. Comp. Laws § 750.505 cannot be invoked as a basis to convict if the elements of the crime are the same as another statutory offense).

Nevertheless, even if that were the case, the petitioner never raised that argument, and it is abundantly clear from the record that the jury verdict would have been same absent the error.  The petitioner has not raised any evidence to support a contrary finding, and the record evidence to support the other five grounds was sufficient.

## C.

Third, the petitioner claims that his due process rights were violated by the trial court's submission of the misconduct-in-office count to the jury because the circuit court lacked jurisdiction over two of the grounds included in that charge.  The petitioner posits that the theories of misconduct based on the severance agreements and the vacation payout were never adjudicated by the examining magistrate at a preliminary examination, the district court did not bind the petitioner

over for trial on those theories, and therefore the circuit court was without jurisdiction to include them in the trial.

The state district court plainly did not address all the State's theories of misconduct in office, as the Michigan Court of Appeals acknowledged. "In making its ruling, the district court stated that '[b]eing cognizant of the fact that this court sits not as the ultimate trier of fact, but rather as the examining magistrate, the Court finds that the People have met their burden of proof in at least one of the areas set forth.'" *Redmond*, 2006 WL 3298360, at *4. However, the court of appeals noted that the bind-over was proper because probable cause existed, and because the State offered evidence at the preliminary examination on those theories, the petitioner had notice of the charges. *Ibid.*

The question of the trial court's jurisdiction is a state law matter. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). As a matter of federal law, the purpose of a preliminary examination is to determine whether probable cause exists to justify continued detention of a person charged by complaint or information. *See Gerstein v. Pugh*, 420 U.S. 103, 118 (1975). The abridgement of that right may undermine the validity of continued pretrial detention, but not the ensuing conviction. Under Michigan law, any error in the sufficiency of the proofs at preliminary examination is considered harmless if there is sufficient evidence to convict at trial. *See People v. Hall*, 435 Mich. 599, 602-03, 460 N.W.2d 520, 522 (1990). So it is under federal law as well. *See United States v. Mechanik*, 475 U.S. 66, 73 (1986). Moreover, there is no federal constitutional right to a preliminary examination. *See Gerstein*, 420 U.S. at 123 & 125 n.26 (1975); *Dillard v. Bomar*, 342 F.2d 789, 790 (6th Cir. 1965).

Of course, the petitioner was entitled to notice of the charges against him so he could prepare an adequate defense.  *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *see also Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005).  But the petitioner does not allege that he was surprised by the inclusion of the two theories of misconduct at trial.  The bind-over decision itself invokes a question of state law, which is not cognizable on habeas corpus review.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Dorchy v. Jones*, 320 F. Supp. 2d 564, 578-79 (E.D. Mich. 2004) (denying habeas relief on petitioner's claim there was insufficient evidence to bind him over for trial).  The petitioner has not identified any federal right that was abridged by the inclusion of those theories at the trial. He is not entitled to a writ of habeas corpus on the basis of this claim.

### D.

Fourth, the petitioner claims that his Sixth Amendment right to confront witnesses was violated when the trial court admitted into evidence an OISD school board resolution, identified as Exhibit 88, that contained the school board's reasons for terminating the petitioner's contract.  The State argues that this Court may not reach this claim because it was procedurally defaulted.

When the state offered Exhibit 88 during trial, defendant's counsel made the following objection:

> Mr. La Rene:  Okay.  Exhibit 88, the proposed Board resolution.  I argued previously to the extent that it incorporates the investigative findings of the Whall Group, it should not be admissible under Rule 803.8, that is the public records exception -- 808 -- 803.8(B) to the extent that it encompasses assertions of fact and it is offered for the truth of the matter asserted therein, that is --

> The Court:  No.  This is the problem.  You offered an exhibit, it was admitted in, to show that they got an award because they -- you just made the argument a moment ago, in July they got this information, in April they give him, and then they fire him.  Why would they fire him? That would be hanging out there as a fact question for the jury, and

I think that that exhibit, which is what we're using, apparently, of these minutes, is going to be admitted, for that simple reason.

Mr. La Rene:   There's testimony about why he was fired.  I believe the question is --

The Court:   I don't think there's any testimony specifically setting forth, enunciating reason after reason.

Mr. La Rene:   Perhaps not.

The Court:   I think that document is very specific.

Mr. La Rene:   Is the Court admitting this document as evidence --

The Court:   Yes, I am admitting it.

Mr. La Rene:   -- of the truth of the matters asserted therein?

The Court:   I'm --

Mr. La Rene:   If not, I'd ask for an instruction by the jury -- to the jury.

The Court:   Well, what I'm doing is I'm admitting it as an exhibit to, from the minutes of the meeting showing why he was terminated.  Whether it's the truth of the matter asserted, I don't care.  You can argue that, that it's not.  But then we have to do that to everyone of these documents that you, in fact -- maybe it's not true that he, in fact, got that award.  Do you understand what I'm saying? You offered it for the truth of the matter asserted.

Mr. La Rene:   No, I did not.

The Court:   You can't have your cake and eat it.

Mr. La Rene:   No, I did not offer it for the truth of the matter.

The Court:   What did you offer it for?

Mr. La Rene:   I offered it to prove that the fact occurred, that the event occurred.

The Court:   Well, we don't know that it occurred.  You're offering it to prove that it occurred, and I don't know that it occurred.

-29-

Mr. La Rene:  The public record is competent to prove --

The Court:   Thank you.  That same argument is applied to this one.

Mr. La Rene:  I -- I --

The Court:   Thank you.

Mr. La Rene:  I must respectfully disagree.

The Court:   Well, I thank you for doing it respectfully.  It can be admitted.

Tr. Transcript, Vol. VI, Jan. 27, 2005, at 794-96.

After the defense rested, the Court led a discussion regarding jury instructions, during which defense counsel mentioned the *Crawford* challenge during a testy exchange with the trial judge:

Mr. La Rene:  . . . Mr. Rollstin's cross-examination of Mr. Simonson yesterday suggests to me that the prosecution is relying on Exhibit 88, which is the Board's resolution, as substantive evidence of the allegations made therein.  I believe that such use would contravene the defendant's Sixth Amendment rights, and I specifically am thinking about the most recent united States Supreme Court case, Crawford against Louisiana.

The Court:   Help me with that.  How is that violating his Fifth (sic) Amendment?  If you --

Mr. La Rene:  Well, for example --

The Court:   If you -- look.  We started down that slippery slope when you all wanted to get in as public records.  If you'll recall, I was hesitant towards that.  Once we started down that slope and it started in, that's the way it's going to be.

Mr. La Rene:  Well, Judge, respectfully, the -- I believe that to use -- I move to strike Exhibit 88 or to bar argument to the effect that it's, the statements made therein or attributed therein to the Board should be considered in the case against the defendant on the basis of Crawford against Washington and the Sixth Amendment of the United States Constitution.

-30-

The Court:      Thank you. I'm denying it. I don't think it's applicable and I think, in fact, if it were, it was waived during a portion of the trial. Okay? Does that help?

Tr. Transcript, Vol. VII, Jan. 28, 2005, at 986-87.

After the case had been submitted to the jury, defense counsel moved to strike portions of Exhibit 88, and the following exchange took place:

Mr. Kriger:     The next -- my problem with all of this is it talks about high standards of honesty, integrity, impartiality. I don't have any problem with where it says, "whereas the Oakland School Board finds good and just cause for the termination of James G. Redmond's employment as Superintendent of Oakland Schools and," which would be the last paragraph on that page. And then it just says, "Whereas," on the next page, "Whereas the Oakland School Board finds that based on" and strike "a pattern and practice of numerous deliberate and specific instances which have come to Oakland --"

The Court:      Now I'm going to tell you. I want to repeat what I said once before. You both started with this about introducing these records as public records and you insisted on it. Listen.

Mr. Kriger:     All right.

The Court:      Secondly, in this particular thing, I dedacted [sic] matters that I thought were inflammatory, potentially more prejudicial than probative. Actually, a number of the things here were definitely and could have been easily probative. Do you understand that? But since they weren't part of the proofs, that's why they were dedacted [sic]. Everything else is exactly what the Board did for the reason it is. And so we're not going to talk about it anymore. This is actually the third time you've raised the issue in connection with this. And you've already pointed out that you looked at it. Perhaps you should have looked at it more carefully before. So I repeat. Your motion is denied. You've noted it for the record.

Mr. Kriger:     May I just --

The Court:      But I repeat what I said for the record. I gave you one big break by dedacting [sic] it in the first place. I could have just said, "Well, it's the whole record. Let it go in." I didn't think it was fair to the defendant, and that's why I didn't allow it.

-31-

Mr. Kriger:     Judge, may I just mark this as an exhibit to the record so they know which specific portion --

The Court:      It's already in the record.

Mr. Kriger:     No, no.  What I specifically objected to is noted in red.  I would mark it --

The Court:      No.  What you specifically object to is anything you don't like in it, and that's, and that, and that particularly scuttles the reason.  And the first --

Mr. Kriger:     There is --

The Court:      -- it is a public record.  It is in. The answer is -- you want it marked as a special exhibit?  Be my guest.

Mr. Kriger:     Thank you.  That's all -- and I'll mark it --

The Court:      Thank you.

Tr.Transcript, Vol. VII, Jan. 28, 2005, at 1173-75.

On direct appeal, the Michigan Court of Appeals applied a plain-error standard to review the constitutional claim.  The court reasoned that the petitioner, who had objected to admission based on hearsay grounds, had failed to preserve his constitutional claim by not making a contemporaneous objection on the constitutional ground. *Redmond*, 2006 WL 3298360, at \*6.  The court of appeals concluded that "reversal [was] not warranted based on [petitioner's] Sixth Amendment [claim] because admission of the resolution did not result in the conviction of an actually innocent defendant and did not affect the fairness, integrity, or public reputation of the judicial proceedings. *Ibid.*  The respondent argues that failure to make a contemporaneous objection serves as an independent and adequate state law ground on which the state court properly denied relief, and that plain-error review does not constitute a waiver of state procedural default rules.

-32-

A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Such a default may occur if the state prisoner fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, *e.g.*, make a contemporaneous objection or file a motion for a directed verdict, *see Simpson v. Sparkman*, 94 F.3d 199, 202-03 (6th Cir. 1996).

The petitioner, citing *People v. Jones*, 468 Mich. 345, 354-55, 662 N.W.2d 376, 381 (2003) ("The purpose of requiring objections to be timely . . . is to give the trial court an opportunity to correct the error.") and *People v. Grant*, 445 Mich. 535, 551, 520 N.W.2d 123, 130 (1994) ("[T]he United States Supreme Court has recognized the importance of an incentive for criminal defendants to raise objections at a time when the trial court has an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights."), argues that his *Crawford* objection was timely because it was made as soon as the constitutional dimension of the error in admitting Exhibit 88 became apparent, before the damage had been wrought and at a time when the trial court still had a meaningful opportunity to prevent the harm which the objection sought to avoid. The petitioner has a point. The record suggests that the trial court did not permit trial counsel to complete the record when he barely got out his objections on hearsay grounds. And the Confrontation Clause ground for contesting the exhibit was presented to the trial with plenty of time to deal with it. Moreover, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Although a procedural bar may

-33-

preclude relief, "[j]udicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of the petitioner's claims.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The rights of confrontation and cross-examination "have ancient roots" which the "Court has been zealous to protect . . . from erosion." *Id.* at 404-05 (internal quotation omitted). The right to a trial by jury is predicated upon the belief "'that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.'" *Id.* at 405 (quoting *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that certain out-of-court statements are barred by the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity for cross-examination, even if the trial court finds the statements to be otherwise reliable. 541 U.S. at 68. The Supreme Court has held that the Confrontation Clause applies only to out-of-court statements that are "testimonial" in nature. *See Whorton v. Bockting*, 549 U.S. 406, 419-20 (2007) (explaining that, under *Crawford*, the Confrontation Clause has no application to non-testimonial out-of-court statements); *Davis v. Washington*, 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates

-34-

it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

The *Crawford* court did not define "testimonial," but it "provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations." *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004); *see Crawford*, 541 U.S. at 51-52. In *Davis v. Washington*, the Court explained that "[s]tatements are . . . testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.  Based on that elucidation, the Sixth Circuit clarified in *Miller v. Stovall*, 608 F.3d 913(6th Cir. 2010), that "[t]he proper inquiry . . . is whether the declarant intends to bear testimony against the accused[,which,] in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id.* at 924 (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004); *see also United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (explaining that when "determining whether statements are testimonial, we ask whether the declarant 'intend[ed] to bear testimony against the accused' (quoting *Cromer*, 389 F.3d at 675)).

Exhibit 88 was a resolution by the OISD that set out the reasons for terminating the petitioner.  The exhibit consists of recitals in which the board expressed its reasons that justified the firing, and the resolution of termination itself.  The petitioner has not pointed to any feature of the resolution that suggests that its primary purpose was "to establish or prove past events potentially relevant to later criminal prosecution," *Davis*, 547 U.S. at 822, or that a reasonable person in the

-35-

positions of the board members would anticipate would anticipate [the board resolution] being used against the accused in investigating and prosecuting the crime," *Johnson*, 581 F.3d at 325. And even if that were a close question, which it very well may be, "there is a possibility for fairminded disagreement on the issue, and under clear, and increasingly strident, Supreme Court precedent, that is all that is required to [deny the writ]." *Peak*, 673 F.3d at 474 (footnote omitted). Admission of statements that cannot be deemed testimonial does not violate the Confrontation Clause. *Michigan v. Bryant*, --- U.S. ---, ---, 131 S. Ct. 1143, 1155 (2011) ("Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.").

The petitioner has not identified a clear violation of the Confrontation Clause that warrants issuance of the writ. He is not entitled to relief on this claim.

E.

The petitioner claims that his due process rights were violated by the trial court's instruction on the "corrupt intent" element of the misconduct-in-office charge because the court left out the words "depravity" and "perversion" from the jury instruction, leaving only the term "taint." The Michigan Court of Appeals rejected the petitioner's claim.

> The parties agreed on the elements of the offense, agreed that the prosecutor had to establish that defendant acted with a "corrupt intent," and agreed that *Coutu*, *supra*, was the relevant case that defined the term "corrupt intent." In *Coutu*, this Court stated that the term "corruption" means "a 'sense of depravity, perversion or taint.'" *Coutu*, *supra* at 706. In discussing the proper instructions regarding the term "corrupt intent," the prosecution explained to the trial court that it was only proceeding on the theory of "taint," and not under the theory that defendant's conduct constituted "depravity" or "perversion." Therefore, the prosecutor argued that the trial court only needed to define the term "taint" for the jury, and not the words "depravity" or "perversion." Defendant contended that the trial court should instruct the jury on all three definitions because "it fleshes out the concept of what corruption means[.]" The trial court disagreed, observing that the use of the word

"or" in *Coutu* meant that the prosecutor had a choice of which theory of corrupt intent it wanted to proceed under. The trial court's corrupt intent instruction is as follows:

> Fourth, these acts must be done with a corrupt intent. A corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of an officer . . . . Corruption means depravity, perversion, or taint. Now, the definition of taint includes a trace of something bad or - - we're not - - apparently they're not worrying about depravity or perversion here, but they're concerned about taint, so we'll define taint. And taint includes a trace of something bad or offensive. . . .

According to defendant, by only defining the word "taint" to the jury, the trial court took the word out of context and "diluted the level of proof required to maintain a conviction." We disagree. Under MCR 2.516(D)(4), a trial court may give additional instructions concerning an area that was not covered in the standard jury instructions as long as the additional instructions accurately state the law and are applicable, concise, understandable, conversational, unslanted, and nonargumentative. *People v. Lynn*, 229 Mich. App 116, 121; 580 NW2d 472 (1998), *rev'd on other grounds* 459 Mich. 53 (1998). In this case, the trial court's corrupt intent instructions accurately stated the law and otherwise complied with these requirements. In *Coutu*, this Court stated that the term "corruption" means "a 'sense of depravity, perversion or taint.'" *Coutu*, *supra* at 706 (citation omitted; emphasis added). The use of the disjunctive word "or" generally refers to a choice or alternative between two or more things. *See People v. Neal*, 266 Mich. App 654, 656; 702 NW2d 696 (2005) (interpreting the word "or" in MCL 750.335a). The words "depravity," "perversion," and "taint" express three alternative concepts or choices of corrupt behavior. Therefore, corrupt behavior for purposes of the misconduct in office charge is behavior that falls into any one of the three alternative definitions. Because the prosecutor proceeded on the theory that defendant's conduct constituted "taint," it was reasonable for the trial court to instruct the jury only on the definition of "taint." The trial court's definition of the term "corrupt intent" therefore fairly presented the issues to be tried and sufficiently protected defendant's rights.

Moreover, a trial court's refusal to give a requested instruction only warrants reversal if a defendant shows that it is more probable than not that the trial court's failure to give the requested instruction undermined the reliability of the verdict. *People v. Tierney*, 266 Mich. App 687, 714; 703 NW2d 204 (2005). In this case, the fact that the trial court did not define the "depravity" and "perversion" alternatives of "corrupt intent" did not undermine the reliability of the verdict because the prosecutor did not proceed under those theories and did not present evidence regarding those theories at trial. The prosecutor's theory and evidence related solely to the theory that

-37-

defendant's conduct constituted "taint" and was bad or offensive. Therefore, the trial court's instructions did not undermine the reliability of the verdict.

*People v. Redmond*, 2006 WL 3298360, at *8-9.

The petitioner argues that "wrenching" the word "taint" from the *Coutu* formulation of corrupt intent itself perverts the definition of that element because it leaves the jury to guess at what might constitute "a trace of something bad"; and it allowed the prosecutor to argue that the law merely required him to prove that the petitioner's actions could not "pass the smell test."

The definition of elements of a crime under state law is left to state, not federal, courts. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus" (citations omitted)).  That is why, "[g]enerally speaking, a state court's interpretation of the propriety of a jury instruction under state law does not entitle a habeas claimant to relief."  *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (citing 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  As the Sixth Circuit has explained, "[t]he exception is when the instruction is so flawed as a matter of state law as to 'infect[] the entire trial' in such a way that the conviction violates federal due process."  *Ibid.* (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).  Other formulations of that test use even stronger language.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right . . . .").  When assessing a potential due process violation, the jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

-38-

The petitioner's way around the language discouraging review by habeas courts of state court jury instructions is a due process argument that says either the petitioner did not have fair warning that his conduct was criminal, or that the jury was not given sufficient guidance by the court's corrupt intent instruction and therefore had to guess at the meaning of the criminal law. The petitioner did not raise that argument in the trial court, but the state court of appeals addressed it on the merits anyway. That court stated:

> Defendant next argues that the terms "bad" or "offensive" are unconstitutionally vague because they are so indefinite that they confer unlimited discretion on the trier of fact to determine whether an offense has been committed. Defendant did not make this vagueness argument before the trial court. Generally, issues that are not raised before and addressed by the trial court are not preserved for appellate review. *Fast Air, Inc v. Knight*, 235 Mich. App 541, 549; 599 NW2d 489 (1999). However, because this Court may consider a significant constitutional issue that has not been raised before the trial court, *People v. Walker*, 234 Mich. App 299, 302; 593 NW2d 673 (1999), we will address the issue. An unpreserved constitutional error is reviewed for plain error affecting substantial rights. *Carines*, *supra* at 763, 774. Reversal is warranted when plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation or judicial proceedings independent of the defendant's innocence. *Id.*

> The trial court's instructions to the jury included instructions that the prosecutor had to prove the following elements of the misconduct in office offense beyond a reasonable doubt: that defendant either held public office or was the agent or servant of a public official, that defendant's acts must have been conducted in the exercise of the duties of the office or done under the color of the office, that the defendant's acts constituted malfeasance, misfeasance, or nonfeasance (the trial court defined all three of these terms in its instructions), and that defendant's acts must have been done with a corrupt intent. In explaining the corrupt intent element, the trial court asserted that a corrupt intent could be established "where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties . . . of an office by an officer." The trial court then defined the term "taint" as "a trace of something bad or offensive" and observed that "[t]he corrupt intent needed to prove misconduct of office does not necessarily require an intent for one to profit for oneself." The trial court also defined the term public officer. These instructions, viewed as a whole, would not confer unlimited discretion on the trier of fact to determine whether an offense was committed. The trial court's jury

> instructions on the misconduct offense accurately stated the applicable law and the
> jury was therefore properly instructed.  There was no plain error.

*Redmond*, 2006 WL 3298360, at *9.

The Court cannot say that the state court of appeals's treatment of the instructional issue amounted to an unreasonable application of federal law.  The petitioner's argument presumably derives from a line of cases that proscribe criminal legislation that is vague.  The twin evils of a vague criminal statute are the failure to provide fair notice "with sufficient definiteness that ordinary people can understand what conduct is prohibited," and the allowance or encouragement of "arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  The petitioner does not argue a lack of fair notice, but he does contend that the instructions left the jury on its own to determine whether the petitioner had a corrupt intent.  He cites *Smith v. Goguen*, 415 U.S. 566 (1974), where the Supreme Court invalidated a flag-misuse statute criminalized "treat[ing] contemptuously the flag of the United States," because the statutory language "fail[ed] to draw reasonably clear lines between the kinds of nonceremonial treatment that are criminal and those that are not."  *Id.* at 574.

The jury instruction in this case does not share the same flaws, however.  Although defining "taint's" contextual partners — depravity and perversion — would have been preferable so as to give the jury a broader view of the intent element of this common law crime as contemplated by the state courts, the definition of "taint" as a trace of something bad or offensive, when read along with the requirement to find "intentional or purposeful misbehavior," was not unconstitutionally vague. The jury could not convict under the instructions unless it found that the petitioner intentionally engaged in  misbehavior that was motivated by a trace of something bad or offensive.  The state court's determination that a person of ordinary intelligence would understand what conduct was

prohibited, and that the jury was not left to convict based only on its subjective assessment of the petitioner's motive, did not unreasonably apply federal law. *See Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (citing *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252-54 (6th Cir. 1994) (rejecting district court's "as applied" analysis of statute with criminal penalties, and concluding that the particular statute was unconstitutionally vague on its face)).  The petitioner is not entitled to a writ of habeas corpus on this ground.

### F.

Lastly, the petitioner claims that the prosecutor committed misconduct in his closing arguments by stating that the petitioner had used his influence to obtain employment for his son and that the petitioner might work one day for the MINDS entities.  The petitioner takes issue with the prosecutor's statements made during rebuttal:

> And, you know, one point, you know, kind of trivializing what happened on behalf of his client, you know, Mr. LaRene says, "Well, what's wrong with that?"  You know, "what's the matter with that?", you know, when he was talking about Jim Redmond's son getting a job.  There's nothing wrong with his son going out and getting a job.  What's wrong is, number one, Dr. Redmond using his influence as a public official to benefit his family.

Trial Tr., Jan. 28, 2005 at 1128.  In response to the prosecutor's remarks, the following exchange occurred.

> Mr. La Rene:  I'm going to object.  This isn't a part of the charges.
>
> The Court:     I'm sorry?  What?
>
> Mr. La Rene:  There's no charge here that Dr. Redmond improper[ly] used his influence as a public official to get his son a job.  That's the specifications of misconduct in office are what they are.  I mean, don't include that.

The Court:    Excuse me.  The testimony is what it is.  I'll let the jury decide in connection with it.  I'm - - Confine yourself to the counts that we have, though.  Thank you.

Mr. Rollstin:   And lying to the Michigan Department of Education about it.  You know, I mean, and he can talk about profiting and, you know, Mr. LaRene can try and spin it in any way he wants, but, yeah, his son got a job out of the deal, he did.  That job was created for Jim Redmond's son.  And Marvin Sauer said so.  I mean, he didn't say it exactly that way, but he you know, "Was the job there before?"  "No."  Okay.  Well, when it was - - in other words, according to Marv Sauer, when he talked about it, "Yeah, my son is looking for a job."  "Oh, okay.  Well, you know, have him send his resume over."  You know?  It wasn't vacant before, though, so there's a position for him.  And then he tries to trivialize, you know, the $674 a week.  Well, you know, to some people, that's a salary.  To some people, you know, that's real money.  "Yeah, my son is profiting from this arrangement." . . . And you know, he worked for MINDS.  Okay?  That's what the testimony was.  Jim Redmond, Jr. worked for MINDS.  And some of the time the defense, you know, wants to talk about who did the work.  Well, they say, "Well, it really wasn't The MINDS Institute.  It was MINDS, LLC."  Well, they're doing – according to that, if you attach yourself to that theory, they're doing $500,000 plus worth of work.  It's a $900,000 a year company, is what their revenues were back in 2000/2001.  Well, and his son is, you know, on the payroll for $34,000 a year.  I mean, did that give, did that contract give them the ability to hire his son?  I mean, if they don't get that contract, now they're only making 4 or $500,000 a year.

*Id.* at 1128-30.

The petitioner also takes issue with the prosecutor's statement that the petitioner likely was going to work for TLC after he left OISD.  The prosecutor stated:

Mr. Rollstin:   . . . The -- if you're going to wire up -- if you're going to have this plan to get all this product or content to the kids, you'd wire up all the schools.  Well, anyway, Marv Sauer says, "We wanted to use Oakland Intermediate School District as a platform that we could market to other school districts, other people throughout the country."  These guys believed they were going to make a lot of money.  And maybe they were.  I mean, these -- they, they were, they thought they were on the cutting edge, they were, they were on the front end of a dot.com idea, you know, where visionaries, where technology is

-42-

going to be, get us into the next millennium. Okay? Marv Sauer wants to be able to go out and show the world what he did at the Oakland Intermediate School District. Okay? Well -- and he does show a propensity for hiring people that are close to this project into his organization. How much of a leap is it that Jim Redmond might one day work for TLC?

Mr. La Rene:   I just can't imagine how that could be proper argument. There's not a single shred  --

The Court:   I think it's -- excuse me -- I think you don't want to enter into speculation. It's a valid argument that you might want to make, but don't enter into speculation.

Mr. Rollstin:   I won't, Judge. May I continue the argument?

The Court:   Yes. Go right ahead.

Mr. Rollstin:   Thank you. How much of a leap is that, that, you know, a guy nearing retirement is going to go over to --

Mr. La Rene:   I'm sorry, Judge. I thought the Court sustained the objection.

The Court:   Excuse me.

Mr. Rollstin:   You know what?

The Court:   Pardon?

Mr. La Rene:   I misheard. I thought you sustained the objection.

The Court:   You put on the record when we're off, when he's done.

Mr. La Rene:   Very well.

The Court:   Okay? At this point in time, I have heard nothing that shakes me. You understand? Now, you may not like it, but this is argument. That's why it's called argument.

Mr. La Rene:   I thought the Court was, was -- counsel --

The Court:   Counsel, I don't remember him interrupting one time during some of the statements you made.

-43-

Mr. La Rene:   Well, that's -- he certainly was at liberty to do so, sir.

The Court:   Thank you very much.  I, I disagree.

Mr. La Rene:   I don't think I --

The Court:   At this point it is disruptive.  So please don't do it.

Mr. La Rene:   I'm, I - - well, I - - no more objections, I guess.

The Court:   Thank you.

Mr. Rollstin:   Ask yourself, you know, one of the things you're allowed to do as a jury is draw reasonable inferences from the evidence.  That's what you're allowed to do.  Well, how many people did TLC hire out of the Oakland Intermediate School District's family, if you will?  And Marv Sauer said, "Oh, he's a visionary, he's highly valued."  Okay?  Well, when Marv Sauer wanted to take this idea on the road and tell everybody what a great thing he was doing, what kind of value would Jim Redmond have if he were part of the TLC group then?  He would be somebody that - - I mean, with in-house, we have the former superintendent of Michigan's largest intermediate school district.  And this is where it all got off the ground.  You know, Simonson went out and made $40,000 plus five days a month like that (snapping fingers).  Defendant was making $250,000 working in the public sector.  What would his value be at TLC?  You know, greed can come in many ways.  It can come in greed for power or greed for money.  I told you earlier that this case captured both, I believe.  And when you think about what Marv Sauer and Karl Seiler were willing to do with Jan VanDam's daughter and his son and also their statement that this guy was valuable, he was somebody who was recognized as a visionary, wouldn't they want him in house?  Wouldn't he add value to this concept of where they could take this idea on the road to sell it to other districts?  Wouldn't he bring instant credibility to them if they had him within their business?

Trial Tr., Jan. 28, 2005 at 1138-41.

The Michigan Court of Appeals rejected this claim, stating:

Defendant is correct that a prosecutor is not permitted to argue facts that are not supported by the evidence.  *People v. Watson*, 245 Mich. App 572, 588; 629 NW2d 411 (2001).  However, a prosecutor is free to argue the evidence and any reasonable inferences arising therefrom as they relate to the prosecutor's theory of the case.  *Id.*

-44-

The prosecutor's comment about defendant using his influence as a public official to benefit his family was not improper because it was based on the evidence and reasonable inferences from the evidence. Marvin Sauer hired defendant's son to work for MINDS LLC. Sauer explained that he became aware that defendant's son was looking for work through a conversation he had with defendant. Sauer hired defendant's son to fill a newly created position on October 16, 2000, which was approximately two months before the $120,000 Contracted Services Contract was signed between the OISD and the MINDS Institute. Based on this evidence, an inference can be made that defendant used his influence as superintendent of the OISD and the possibility of a contract with the OISD to procure a position for his son with MINDS LLC. Therefore, the prosecutor's comment was not improper because it was based on the evidence or reasonable inferences from the evidence.

Similarly, the prosecutor's comment about the possibility of defendant working for one of the MINDS corporations was also based on reasonable inferences from the evidence. Sauer testified that he met defendant in 1999 and recruited defendant to become involved in the development of the MINDS project because of defendant's vision and guidance. According to Sauer, he sought an educational partner for the MINDS project, and the Oakland schools and defendant, as superintendent of the Oakland schools, were a good match. The MINDS Institute earned over $500,000 from the Oakland OISD because of defendant's assistance. Based on this evidence, it is reasonable to infer the possibility that defendant might work for TLC or the MINDS entities as a reward for his efforts in securing the OISD's involvement with the MINDS project and also because defendant had the educational background that made him a good educational partner for the MINDS Institute. Therefore, the prosecutor's comments about defendant potentially working for the MINDS Institute in the future were based on reasonable inferences from the evidence, and the trial court did not abuse its discretion in denying defendant's motion for a directed verdict.

*People v. Redmond*, 2006 WL 3298360, at *10-11.

It is well established that prosecutors must "'refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for a new trial and habeas relief only if the alleged misconduct "'so infected the trial with

-45-

unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477

U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To

constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it

permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000)

(quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). "The Court must examine 'the

fairness of the trial, not the culpability of the prosecutor.'" *Pritchett*, 117 F.3d at 964 (quoting *Serra*

*v. Michigan Dep't of Corrs.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

When assessing such a claim, the Court first considers whether the prosecutor's conduct or

remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, the

Court then must decide whether the improper acts were so flagrant as to warrant relief. *Id.* at 516.

The Sixth Circuit applies a four-factor test to any inappropriate prosecutorial conduct to determine

whether it was flagrant: "(1) whether the evidence against the defendant was strong, (2) whether the

conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the

conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately

or accidentally." *Id.* (citation omitted).

The Court does not find improper the prosecutor's statements concerning the petitioner's son.

Testimony offered at trial revealed that Marvin Sauer became aware that the petitioner's son was

looking for a job through a conversation he had with the petitioner around the same time OISD

contracted with the MINDS Institute to perform more than $500,000 worth of work. Sauer also

testified that the position had been newly created. The prosecutor's statement regarding the

petitioner using his influence to get his son a job was not improper because it was a reasonable

inference drawn from Sauer's trial testimony and the petitioner's refusal to disclose his son's

employment relationship. "A prosecutor has 'leeway to argue reasonable inferences from the evidence' during closing arguments." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (quoting *Byrd*, 209 F.3d at 535).

The prosecutor's statement that the petitioner might work for TLC after leaving OISD is a different story. There was no testimony or evidence presented at trial that would allow a rational trier of fact to draw that inference. *Byrd*, 209 F.3d at 535 ("It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial.'" (quoting *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995))). Although improper and potentially misleading, however, the comment was not so flagrant as to warrant habeas relief. The evidence against the petitioner was strong, the prosecutor's conduct was isolated, and the prosecutor's comment was not framed as an assertion of fact. Rather, the prosecutor, in stating, "How much of a leap is it that Jim Redmond might one day work for TLC?" asked the jury to consider the possibility and did not state affirmatively that the petitioner would be employed by TLC or a MINDS entity. Moreover, the Sixth Circuit "has held that the trial court can generally correct such improprieties by instructing the jury that closing arguments are not evidence." *Crosgrove*, 637 F.3d at 664 (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)). And in this case, the trial court instructed the jury to consider only properly admitted evidence. After closing arguments, the trial court gave the following instructions, among others:

> When you discuss the case and decide on your verdict, you may only consider the evidence that has been properly admitted in this case. Therefore, it's important for you to understand what evidence is and what's not evidence. Evidence includes only the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you you could consider as evidence, such as stipulations by the parties.
>
> Now, many things are not evidence, and you must be careful not to consider them as such. And I'll describe some of the things that are not evidence.

-47-

The fact that the defendant is charged with a crime and is on trial is not evidence. Likewise, the fact that he's charged with more than one crime is not evidence.

The lawyers' statements and arguments are not evidence. They're only meant to help you understand the evidence and each side's legal theories.

Trial Tr., Jan. 28, 2005 at 1146-47.

The Court finds that the Michigan Court of Appeals's decision with respect to the petitioner's prosecutorial misconduct claim was not contrary to clearly established federal law as determined by the Supreme Court. Therefore, the petitioner is not entitled to habeas relief on this claim.

III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that his convictions or sentences were obtained in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated:  July 17, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 17, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL